Filed 5/27/21  Marriage of Miles CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re Marriage of KAREN and CURT MILES. | B303808 |
| | (Los Angeles County Super. Ct. No. 19STFL08238) |
| KAREN M. MILES, | |
| Respondent, | |
| v. | |
| CURT A. MILES, | |
| Appellant. | |

APPEAL from order of the Superior Court of Los Angeles County, Bruce G. Iwasaki, Judge.  Affirmed.

James Alex Karagianides for Appellant.

Ferguson Case Orr Paterson and Wendy C. Lascher for Respondent.

# INTRODUCTION

Karen filed for a divorce from Curt to end their 20-year marriage.[1]  A week and a half later, she filed a request for a domestic violence restraining order (DVRO) against Curt.  She described various incidents from the course of their marriage as examples of Curt's "verbal and emotional abuse."  She alleged he sent her "multiple harassing electronic communications" and fought with her about her spending and failure to use coupons, the totality of which disturbed Karen's peace of mind and caused her distress.

The trial court found the text messages were not abusive and that Curt did not exert financial control over Karen.  Ultimately, however, it granted Karen's request based on evidence of incidents that took place during the parties' last five years of marriage, including Curt yelling and screaming within a few feet of Karen over decorating the Christmas tree without him, and Curt breaking a door by angrily slamming it a few times during an argument over Karen hiring a handyman.  The trial court issued a two-year restraining order against Curt.

Curt appeals from the restraining order, contending substantial evidence does not support the trial court's finding that he committed an act of abuse under the DVPA.  Curt argues the evidence shows "only that the parties argued, loudly but briefly, on several occasions" and that "arguments of the kind at issue here do not justify the issuance of a restraining order."

We disagree with Curt and affirm the order.

---

[1]    Because the parties share the same last name, we refer to them by their first names to avoid confusion.

2

# FACTUAL AND PROCEDURAL BACKGROUND

A.    *Relevant Background Information*

Curt and Karen married on July 10, 1999.  They adopted two (now young adult) children—Justin and Nick.

Karen is a managing director at a national investment banking firm and the primary income earner in the marriage. Curt previously worked in the film industry; he was the primary caretaker of their children for the last 10-or-so years.  The parties agreed Curt would stay home with the children after Nick was diagnosed with ADHD, autism, and other special needs that require lifetime support.

The parties own two residences—a house in Hidden Hills and a condominium in Century City.  During the last three years of marriage, Curt lived at the Hidden Hills home with their children[2].  Karen lived at the Century City condominium during the week, as it was near her place of work.  She would spend the weekends at the Hidden Hills home.

On July 11, 2019, Karen filed a petition for dissolution of marriage.

B.    *Karen's DVRO Request*

On July 22, 2019, Karen filed an ex parte request for DVRO against Curt.  In addition to requesting an order prohibiting Curt from having any contact with her except about their children via the application Our Family Wizard (OWF), she sought a move-away and stay-away order, requesting that the court prohibit

---

[2]    Justin resided at the Hidden Hills home until September 2018 when he moved to Oregon to attend college.

Curt from going to the Century City condominium where Karen was living.

Karen submitted a declaration in support of her DVRO request. She described the "verbal and emotional abuse" she endured over the past several years, including "yelling, screaming, use of profanity and name-calling." When Curt "gets angry, he screams loudly, his face gets red, the veins on his neck and face bulge and spittle will spray from his mouth."

She described the following recent instances of abuse.

1) The Handyman Incident – September 2015

In September 2015, Karen hired a handyman to fix a door latch and perform other small tasks around the house. When Curt returned home and saw the repairs, he "went into a rage." His face grew red and he screamed at Karen for wasting money on a handyman when Curt planned to fix things himself. Curt followed Karen into the master bedroom and continued "his verbal assault." He "lost total control" and slammed the master bedroom door "so hard that it broke off its hinges."

2) The Back-Pain Incident – April 2018

On April 15, 2018, Karen was experiencing unbearable back pain and told Curt she wanted to go to the emergency room. Curt complained a trip to the emergency room would be too expensive and "prevented" her from calling an ambulance. The next day, Karen called her best friend Susan, who helped take her to the doctor. Karen ultimately underwent back surgery.

After the surgery, Karen's doctor advised her to sleep on a firmer mattress. Karen and Curt bought a new mattress. But after the mattress arrived, Curt "continually yelled and screamed at [her] about how the mattress hurt his shoulder." Karen offered to buy another mattress but Curt continued to yell at her.

4

3)    The $5 Coupon Incident – April 2019

In April 2019, Karen took Nick to a discount hair salon, Great Clips, for a haircut; it cost under $20. When Curt saw Nick's haircut, he asked Karen if she used the $5 coupon they had received. Karen admitted she forgot about the coupon and Curt "screamed at [her] for forgetting the coupon." Karen described it as "humiliating and emotionally debilitating."

Karen alleged that while she is the "primary income earner" in the marriage, many of Curt's "outbursts are income focused" as he complains about her spending. Karen alleged there have been incidents in the past where Curt lost his temper in public or while on vacation about trip and hotel expenses.

4)    The Framed Photograph Incident – June 2019

Curt was carrying a mattress up the stairs at the Hidden Hills home when he accidentally knocked over a framed photograph that shattered and broke. Curt "went into a rage" and blamed Karen because "it never would have happened had [Karen] not purchased a mattress that hurt his back." Sometime later, Karen took the framed photo to Michaels to ascertain whether it could be fixed; it was beyond repair. Karen used "a coupon for 70% off" and bought a frame that was "almost identical," at a total cost of $130; she "thought that would please [Curt] since he liked to use coupons."

When Curt found out on June 30, 2019, he "flew into a rage" and "demanded [she] return the original frame." His face was red, he "ranted and raved", and "was particularly frightening on this day." Karen was afraid Curt "might do something to hurt" her. That night she "left the [Hidden Hills] house for good."

On July 6, 2019, Karen informed Curt she could no longer tolerate his "continued tirades and rages directed towards" her.

She told him not to contact her unless it was related to their children or to Karen picking up her personal property. However, Curt sent "numerous communications to [her] within a short period of time, knowing that the repeated texts and/or emails constitute annoying and harassing behavior" that disturbed her "peace of mind and create[d] an emotionally distressing time."

On July 18, 2019, Karen contacted Curt and arranged to pick up Nick and some personal items from the Hidden Hills home on July 20. Curt agreed not to be present at such time. On July 20, Karen went to the Hidden Hills home and retrieved personal property, some furniture, and decorative items. Curt sent "harassing and annoying electronic communications despite [Karen's] request that he not communicate," and accused her of taking community property in violation of the Automatic Temporary Restraining Orders that were effective upon Karen's filing of the petition for dissolution.

She attached as exhibits to her DVRO request a copy of the various text message communications with Curt.

The trial court granted a temporary DVRO against Curt (effective until the hearing date), ordering him to stay "at least 100 yards away" from Karen, her car and place of work, and from the Century City condominium. Curt was not allowed to contact Karen for any reason except Nick via OFW.

C.    *Curt's Opposition to Karen's DVRO Request*

Curt opposed Karen's requested DVRO. He provided a declaration expressing his shock about the restraining order as he has "no history of any kind of violence" and in "the 23 years [they] have been together, this is the first time Karen has ever mentioned any kind of harassment." He denied ever having harassed, abused, or intimidated Karen.

6

Regarding the framed photo incident, he said he "was the person who left [the conversation] first so that [they] wouldn't argue anymore." He denied having slammed a door so hard that it broke off the hinges.

He also denied having ever prevented Karen from calling an ambulance. He stated he called and scheduled appointments for her, "physically carried" her down the stairs and into the car, and drove her to appointments. After her surgery, Curt handled all the household needs, helped change Karen's bandages, cleaned her wounds, bought her a wheelchair and walker, and took care of her throughout her recovery. He was "her sole caregiver throughout this entire process" and wanted her "healthy and pain free."

He believed Karen was not in fear for her safety, as she communicated freely with Curt, even after she filed for dissolution, "without any sign of fear" until July 20, right before she filed her DVRO request. As exhibits to his opposition, Curt attached a copy of various text messages with Karen from July 2019 to show how respectful and cordial their communications with one another were. For instance, on July 3, 2019—"three days after Karen claims she left because she was 'afraid' "—Karen texted Curt and invited him to join her at the Hollywood Bowl for the Fourth of July. Further, Karen "came to [the] Hidden Hills house with her brother" on July 4, and "spent 45 minutes together in the kitchen talking about [the] children, socializing and laughing."

Curt believed Karen strategically filed the DVRO request "to gain the upper hand in the dissolution" since he was "the stay-at-home dad while Karen worked, and she is . . . exposed to paying spousal and child support." He denied having sent text

messages to harass her, and stated the parties always "communicated primarily via text message" and all his texts "served a legitimate purpose" such as child care, doctor's appointments, and property maintenance.

According to Curt, Karen is the one with a "history of violence in [their] household" and said her name is listed on the Child Abuse Central Index. In September 2010, Karen hit Nick (then nine years old) with a stainless steel water container which "cracked Nick's forehead open" and required an emergency room visit and eight stitches, resulting in a permanent scar on his forehead. The Los Angeles Department of Children and Family Services (DCFS) was notified and an investigation ensued. After Karen participated in six months of therapy and meetings with the child psychologist, DCFS closed the case and informed Karen she "would be listed in the DCFS Child Abuser database for life."

Curt said Karen similarly threw an object at him on election day November 2016. Curt had returned home with Justin and found Karen "visibly angry" about election results. Karen "flew into a rage and angrily threw a water bottle" at him, hitting him in the chest.

Curt denied he ever "prevented Karen from purchasing anything that she want[ed], staying at any hotel she want[ed]." He stated Karen is the "primary income earner" and that "all of the accounts are in her name"; Curt had access to only one joint account. Curt stated that within recent months, Karen bought Justin "a $35k Lexus," electronics, and cameras; took him on a weeklong vacation to Nova Scotia; and provided him with a credit card to buy anything he wanted. Curt believed Karen's actions displayed "a considerable effort to manipulate the minds of [their] kids and buy their love."

He included as exhibits numerous letters from third parties who attested to Curt's integrity, character, and devotion as a parent and as an exemplary Boy Scout troop leader.

D.  *Hearing on Karen's DVRO Request*

The trial on Karen's DVRO request took place on December 2 and 3, 2019.  Both parties testified, along with Justin, Karen's best friend Susan, and Claudia, the parties' house-cleaner for the last two years.  We summarize their testimony in relevant part.

Curt testified that even after Karen left the Hidden Hills house on June 30, 2019, she invited him to the Hollywood Bowl three times and even spent time with him at the Hidden Hills home on July 4.  He testified that although Karen asked him not to text or email her, she "said in many other e-mails, 'text me this, text me that.'  She said many times to text her back with other stuff."  He explained his understanding that she did not want Curt to call her, but was alright with him texting her, especially as she requested information about the ongoing remodel.

He testified both parties have raised their voices at one another and have argued in the presence of their children.  He admitted to using profanity on "a few occasions."  When asked if he "complained" to Karen about her expenditures, he responded, "Of course.  I think all husbands and wives complain at times about spending money."  He stated he does not "insist," but "I encourage" her to use coupons."  He admitted to having complained to Karen on December 22, 2018 about spending $25 for an early check-in.  He told her that it was "completely insane" that she could not wait one more hour and check-in for free.

Regarding the July 20, 2019 incident, Curt testified he saw Karen arrive at the Hidden Hills house via the Ring application on a date/time she knew Curt would be out of the house with Nick at a Boy Scout flag ceremony. Curt saw Karen laughing as she broke into the house with Justin and three friends. Curt received a text message from Karen that she was going to the house to get her clothes and jewelry. But he watched as she "pretty much cleaned out the house" by taking, among other things, most of their artwork, statues, travel memorabilia, Curt's Breitling watch, and all the checkbooks.

He admitted to a "disagreement over a coupon for a haircut" but not because the coupon saved five dollars, but because the coupon was a fundraiser for the Boy Scouts. Nick was "trying to earn [his] way to summer camp by selling these coupon cards." He stated that when he reminded her of the coupon, she "purposely left the coupon" on the table and went to get the haircut.

He said he does not have the keys to the Century City condominium. He also stated that his last text communication with Karen was at least a week before Karen filed her request for DVRO.

The parties' adult child Justin, then 19 years old, testified next. He said he saw his father be verbally abusive towards his mother up until September 2018 when he moved to Oregon for college. He heard his parents arguing about the picture frame on June 30, 2019. He heard his father call Karen "an inconsiderate, expletive, bitch" with an aggressive, degrading, and demeaning tone and loud voice. Justin testified the argument lasted about 30 to 40 minutes. Justin also testified he was upstairs in his room when his parents had a verbal altercation in 2015 about the

10

handyman incident; he heard a loud thud from the master bedroom. The next morning, he noticed the master bedroom door was off the hinge and tilted against the wall.

As for the Christmas tree incident, Justin testified "no one informed [his] father that [they] were setting up the ornaments. And when Curt came out and saw that the tree was halfway done, he threw a fit," "saying that she was inconsiderate for not thinking about him." Justin described the tone of Curt's voice as "raging" and "confrontational." He said Curt came within inches of Karen and "it looked like he could get in a fist fight at any moment." Justin heard Curt tell Karen: "Inconsiderate bitch. You never care about me. You're always fucking thinking about yourself." The argument lasted 30 minutes. Karen appeared scared.

Susan, Karen's friend of over 30 years, testified. She has personally heard Curt talk to Karen in a degrading manner within the past five years. She said in April 2018, Karen called her because she was in excruciating back pain. When Karen asked for an ambulance, Susan heard Curt say "the hospital couldn't help her" and "it was too expensive and just not advisable to do." She admitted Curt later took Karen to see a doctor. Susan recalled hearing Curt loudly scream at Karen over the phone for ten minutes while Susan and Karen were in France. He was angry Karen and Susan changed the credit card used to charge the rental car costs. Susan confirmed taking at least 20 trips with Karen.

Claudia, who currently cleaned Karen's home only, testified she has seen Curt get angry with Karen "on some occasions in the past," including approximately six months ago when she was cleaning the Hidden Hills home. She recalled Curt yelled and

11

screamed at Karen for about four or five minutes. She also recalled feeling scared that Curt "was going to hurt her or do something." She saw Karen cry.

Karen's testimony mostly repeated the allegations she raised in her DVRO request. She described how "scary" it is when Curt gets angry; his face becomes "all red" and spittle comes out of his mouth. She described his "verbally abusive" behavior: "he would start screaming and yelling in a very loud voice. [¶] Often, you know, there will be profanity. A lot of times he will say very demeaning things to me about how my behavior is stupid or irresponsible." She said she left him for the same reason nine years ago, but "it got better[,] and then it just started again." She stated she never called the police on Curt because she did not know "if the police would care."

Karen testified she had invited Curt to the Hollywood Bowl because she mainly wanted to invite Nick, who lived with Curt at the Hidden Hills home. She knew Curt "doesn't like the Hollywood Bowl and he wouldn't go. But I felt that if I didn't invite him, he might say, 'Well, you can't take Nick.' So I extended the invitation knowing it was highly unlikely that he would go." She also called her brother to come to the Hidden Hills house with her before going to the Hollywood Bowl, so she could have a family member help her "find a way to safely get away from Curt."

Karen stated she was extremely scared when Curt broke the door following the handyman argument. She said Curt was about two to three feet away from her while yelling at her, forcing her to back up. She said his actions disturbed her peace of mind. As for the incident that took place on election night in November

2016, Karen said she did not throw a water bottle at Curt; but rather, she "threw a water bottle at the wall and [it] hit Curt."

Finally, she confirmed she has not heard from or seen Curt since the filing of the DVRO request in July 2019.

The court admitted many exhibits into evidence, including various text messages between Curt and Karen.

E.     *Trial Court Findings & Ruling*

On December 3, 2019, the trial court granted Karen's request for a DVRO against Curt, and made the following findings:

"[W]e don't have a situation where there is physical violence, physical abuse against [Karen].  [¶] But the statute is clear, relatively recently amended, abuse is not limited to the actual infliction of physical injury or assault."

"There are a number of matters that were raised by [Karen] the court is unpersuaded by.  [¶]  The court does not find that there has been financial control by [Curt] . . . .  [Karen] earns all the money in the household" and "has her own accounts.  So there's no financial control by [Curt] against [Karen] at all."

"On the issue of the text messages [Karen]'s position is that there are a plethora of these text messages, and that by itself is abusive."  "The court is unpersuaded . . . .  A number of text messages is really not very persuasive at all.  Text messages are one or two sentences.  So when there are quite a number of them, it's nothing more than half a piece of paper.  The number don't matter.  And the court was struck by—frankly, how cordial they were going both ways almost all of the time.  [¶] The difficulty on that is this apparent disconnect the court finds between the tone of the text messages of [Curt], which are relatively cordial, and the testimony of anger, rage at some point, raised by very trivial

13

matters. And that's something the court has had to think about in terms of how—in terms of [Curt]'s conduct overall. [¶] But the text messages, as such, the court finds are not abusive."

As for the incident where Karen suffered back pain and "the argument seemed to be [Curt] was preventing her from getting medical care. [¶] And the court is not persuaded by that. [Karen] could have called an ambulance on her own."

"There was another episode [Susan] testified to where I believe the parties . . . were in France or something . . . . There was a phone call. He was angry, yelling, because of some booking arrangement. [¶] If that was face to face, I think it would be a different question. But a call over the phone where someone is yelling, the court does not find that to be, by itself, an act of abuse. [¶] However, the court takes that into consideration in weighing other episodes of anger."

"The court is most concerned about several of the incidents that took place in the home. [¶] The oldest one took place in 2015. There's no dispute by [Curt] that he damaged the door to the bedroom in anger. [¶] The only evidence is that over the most trivial of incidents, he became infuriated. And not just a minute or two, but went on and on about it. And paraded [Karen] through the house to show her about all the things that he didn't like. [¶] Now, merely being churlish or immature by itself is not being abusive, but going on and on at that length it is. [¶] And certainly breaking the door is threatening. . . .You don't have to say, 'I'm going to hurt you if you do this' to be a threat. [¶] If you rip the door off the hinges in anger, that is threatening behavior, and that does place somebody in imminent fear of serious bodily injury. [¶] So that is something the court does find an act of abuse."

"[M]aking it not as forceful by itself is that it took place four years [ago]. And the parties continue to cohabit after that. [¶] However, that's not the only episode. There is the episode two years ago, around Christmas time, involving the decorating of a tree. That is one Justin testified to persuasively. That . . . in the middle of the playing of Christmas music and decorating the tree, [Curt] came in and was very, very upset that this tree decorating was happening without him. [¶] Again, very immature behavior. But going off the way he did, yelling and screaming—undisputed that he did that—getting within three feet of [Karen], is threatening behavior. Would disturb any reasonable person's peace. And the court finds that that action did disturb [her] peace and her emotional calm."

"[T]he final straw [was] the episode involving the frame at the end of June 2019. [¶] Once again, another incident triggered by a trivial matter that reasonable people would deal with." "The line the court has to deal with here is when do the arguments persist for so long, with such intensity, and for such trivial causes, that it goes beyond an argument . . . ." "And the whole episode with the frame, simply the fact that [Karen] went to get the frame fixed, and being so angry about it, is another instance of abuse. [¶] The court finds that [Karen] has met her burden of showing acts of abuse committed by [Curt]. [¶] The court finds that [Karen]'s safety would be jeopardized if the court does not issue a protective order in her favor."

The court ordered Curt to stay at least 100 yards away from Karen, her car and place of work, and the Century City condominium. Curt was to communicate with Karen via OFW about their adult children. The DVRO was made effective for a period of two years; it is set to expire on December 3, 2021.

15

This appeal followed.

## DISCUSSION

A.  *Applicable Law and Standard of Review*

The Domestic Violence Prevention Act (DVPA) (Fam. Code,[3] § 6200 et seq.) exists "to prevent acts of domestic violence, abuse, and sexual abuse and to provide for a separation of the persons involves in the domestic violence for a period sufficient to enable these persons to seek a resolution of the causes of the violence." (§ 6220.)  Under the DVPA, a court is authorized to issue a protective order enjoining a party from engaging in specific acts of harassment or abuse against a cohabitant or former cohabitant.  (§§ 6211, subd. (b), 6218, 6322, 6340, subd. (a)(1).)  The court may issue a DVRO if evidence is provided showing "reasonable proof of a past act or acts of abuse." (§ 6300, subd. (a).)  The DVPA requires a showing of past abuse by a preponderance of the evidence.  (*In re Marriage of Davila & Mejia* (2018) 29 Cal.App.5th 220, 226.)

"The DVPA defines domestic violence, as relevant here, as abuse perpetrated against a spouse . . . of a party.  (§ 6211, subds. (a) & (e).)" (*In re Marriage of Davila & Mejia, supra,* 29 Cal.App.5th at p. 226, fn. omitted.)  Section 6203, subdivision (a), defines "abuse" for purposes of the DVPA as conduct described by any of the following four categories: (1) intentionally or recklessly causing or attempting to cause bodily injury; (2) sexual assault; (3) placing a person in reasonable apprehension of imminent serious bodily injury to that person or

---

[3]  All undesignated statutory references are to the Family Code.

16

to another; or (4) engaging in any behavior that has been or could be enjoined pursuant to Section 6320.  Section 6320, subdivision (a), provides in part that "[t]he court may issue an ex parte order enjoining a party from . . . stalking, threatening, . . . harassing, . . . making annoying telephone calls . . . or disturbing the peace of the other party, and, in the discretion of the court, on a showing of good cause, of other named family or household members."  "Disturbing the peace" for purposes of section 6320 means "conduct that destroys the mental or emotional calm of the other party."  (*In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1497; accord, *N.T. v. H.T.* (2019) 34 Cal.App.5th 595, 602-603.)  "As a result, abuse under the DVPA includes physical abuse or injury, as well as acts that 'destroy[ ] the mental or emotional calm of the other party.' " (*Rodriguez v. Menjivar* (2015) 243 Cal.App.4th 816, 820.)

The court's issuance of a restraining order under the DVPA is a discretionary matter.  (§ 6300, subd. (a).)  " 'A trial court's exercise of discretion will not be disturbed on appeal unless, *as a matter of law,* an abuse of discretion is shown—i.e.,—where, considering all the relevant circumstances, the court has "exceeded the bounds of reason" or it can "fairly be said" that no judge would reasonably make the same order under the same circumstances.' " (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 480.)  " 'So long as the court exercised its discretion along legal lines, its decision will not be reversed on appeal if there is substantial evidence to support it.' " (*Ibid.*)  We resolve all conflicts in the evidence in favor of Karen, the prevailing party, and indulge all legitimate and reasonable inferences in favor of upholding the trial court's findings.  (*In re Marriage of Bonds* (2000) 24 Cal.4th 1, 31.)

17

B.  *The Trial Court Did Not Abuse its Discretion in Issuing the DVRO Against Curt.*

Curt argues it was an abuse of discretion for the court to grant the DVRO against him because "substantial evidence does not support the trial court's finding that [he] committed an act of abuse under the DVPA."  He contends the evidence "shows only that the parties argued, loudly but briefly, on several occasions."  He believed "arguments of the kind at issue here do not justify the issuance of a restraining order, even if they induce a level of subjective fear in one of the parties."

On this record, we cannot say the court abused its discretion.  There was substantial evidence of Curt's past and recent acts toward Karen, constituting threatening, abusive behavior that caused Karen emotional distress and disturbed her peace of mind.  The testimony and evidence in the record demonstrate Curt had angry outbursts triggered by Karen doing things that bothered him, such as spending and forgetting to use coupons.  The testimony and evidence also showed that during these outbursts, Curt's face would get red, spittle would come out of his mouth, and he would clench his fists and yell at Karen, use profanity, and say demeaning things to her.  In one incident, Curt damaged the door to the bedroom in anger.  In another incident, he yelled and screamed at Karen for 30 minutes for failing to call him to decorate the Christmas tree with her and the children.  He yelled, "Inconsiderate bitch.  You never care about me.  You're always fucking thinking about yourself."

Curt argues he "never committed or threatened acts of violence."  We disagree.  Karen testified Curt would clench his fists and get within a few feet of her while yelling at her.  Justin testified Curt came within inches of Karen and "looked like he

18

could get in a fist fight at any moment." Curt slammed their bedroom door repeatedly, causing it to break off its hinges. All of this, taken together, constitutes substantial evidence that Curt's behavior toward Karen was at times threatening.

The testimony provided by the parties' son Justin— testimony the trial court found persuasive—corroborated Karen's testimony that Curt would frequently verbally abuse her. Justin described Curt as "raging" against Karen in a "confrontational" manner. He said he saw his father verbally abuse his mother up until September 2018 when he moved to Oregon for college. The trial court weighs the evidence and makes findings on witness credibility, which we do not disturb. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) We conclude the evidence elicited at the proceedings of December 2 and 3, 2019 supports the restraining order.

Likening the circumstances of his case to those in *S.M. v. E.P.* (2010) 184 Cal.App.4th 1249, Curt argues the "critical question before this Court is whether heated, non-violent argument between spouses suffices to support a finding of abuse." However, we find that case does not apply, as the basis of the restraining order in *S.M. v. E.P.* arose from a single incident where S.M. woke E.P. up one morning, tore off the covers and said, " ' "I'll kill you" ' " and called her a " ' "cold bitch." ' " (*Id.* at p. 1254.) This one-time incident is in stark contrast to three different instances of Curt's past acts (i.e., the framed photo incident, the Christmas decoration incident, and the handyman incident)—all instances the trial court found were past acts of abuse by Curt.

Curt contends there is no evidence in the record that he "ripped" the master bedroom door off its hinges or intended to damage the bedroom door. We disagree. Karen testified Curt slammed the door repeatedly, causing it to break from its hinges. Justin testified he heard a loud thud and soon discovered the door broken and tilted against the wall. Curt's argument misses the point. Whether he "ripped" the door or slammed it repeatedly is immaterial. The point is when Curt found out Karen paid a handyman to perform work around the house, he reacted in a way that was more than just heated; he intentionally slammed the bedroom door not once but repeatedly, which caused the bedroom door to break and disturbed Karen's peace.

Finally, Curt argues the DVRO against him does not advance the DVPA's purpose because Karen now resides in a separate residence away from Curt and Curt has not communicated with Karen since she filed the DVRO request. However, section 6300 provides the trial court with authority to issue a DVRO "upon proof of 'reasonable proof of a *past* act or acts of abuse.'" (*Nevarez v. Tonna* (2014) 227 Cal.App.4th 774, 783.) And because the record contains evidence of past acts of abuse by Curt, we see no abuse of discretion in the trial court's decision to issue the DVRO for a period of two years.

On this record, we cannot say the court abused its discretion. There was substantial evidence Curt engaged in past acts that constituted abuse and/or threatening behavior toward Karen that disturbed her peace of mind.

## DISPOSITION

The orders are affirmed.  Respondent Karen M. is awarded costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


STRATTON, J.

We concur:


GRIMES, Acting P. J.


WILEY, J.

21